UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NAIEL NASSAR, M.D. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:08-CV-1337-B |
| | § | |
| UNIVERSITY OF TEXAS | § | |
| SOUTHWESTERN MEDICAL CENTER, | § | |
| PARKLAND HEALTH & HOSPITAL | § | |
| SYSTEM, BETH LEVINE, M.D., and | § | |
| J. GREGORY FITZ, M.D. | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the motion of Defendant Parkland Health & Hospital System ("Parkland") for summary judgment on all of Plaintiff's claims. (doc. 49).[1] For the reasons set forth below, the Court **GRANTS** Defendants' motion.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Dr. Nassar is "Muslim and hales from the Middle East." (doc. 54, p. 2). After graduating from medical school in Egypt, Dr. Nassar completed his internship, residency, and fellowship in hospitals in the United States. (doc. 11, p. 4). He is board certified in internal medicine and infectious diseases. (*Id.*).

In January 2001, UT Southwestern hired Dr. Nassar as an Assistant Professor of internal

---

[1] Plaintiff also asserts claims against Defendants UT Southwestern, Dr. Levine, and Dr. Fitz that are the subject of a separate motion to dismiss and for summary judgment (doc. 42).

medicine and infectious diseases. (*Id.*). His duties were to provide patient care at the Amelia Court clinic, which is an outpatient HIV/AIDS clinic that is part of Parkland Hospital. (*Id.*; doc. 50, p. 9). Dr. Nassar, at all times an employee of UT Southwestern, became the Associate Medical Director of the Amelia Court clinic. The Medical Director of the Amelia Court clinic was Dr. Phillip Keiser, a professor of internal medicine at UT Southwestern. (*Id.* at pp. 3-4).

In 2004, UT Southwestern hired Dr. Levine as chief of the division of infectious diseases, the division in which Dr. Nassar is employed. (*Id.*). Dr. Nassar alleges that "almost immediately after becoming Chief, Dr. Levine began harassing" him. (*Id*). The factual background related to Dr. Nassar's claims for discrimination and tortious interference is described in this Court's order addressing the claims against the other Defendants (doc. 99[2]); Dr. Nassar does not allege any conduct by Parkland related to those claims. The sole claim against Parkland is for retaliatory failure to hire in violation of Title VII. (doc. 54, p. 15; doc. 50, p. 22).

A.   *Dr. Nassar's Negotiations for a Position at Parkland*

On March 1, 2006, UT Southwestern's Promotion and Tenure Committee voted to promote Dr. Nassar to the rank of associate professor, to be effective on September 1, 2006. Despite the offer of promotion at UT Southwestern, Dr. Nassar contends that the alleged harassment by Dr. Levine caused him to see the "writing on the wall," leading him to seek employment elsewhere. (doc. 11,

---

[2] Dr. Nassar's discrimination claims allege that the treatment he received during the promotion review process at UT Southwestern, together with other acts of retaliation that followed his report of discrimination, led to his constructive discharge from UT Southwestern. His claim for tortious interference with prospective contract alleges that UT Southwestern, in retaliation for his report of discrimination, interfered with Parkland's attempt to hire him. (doc. 99). These claims allege conduct by UT Southwestern, and two of its employees, Dr. Fitz and Dr. Levine. Because these claims allege no acts of discrimination or interference by Parkland, this Memorandum Opinion and Order references those allegations only to the extent necessary to provide context for Dr. Nassar's retaliatory failure to hire claim against Parkland.

p. 5). As early as late 2005, Dr. Nassar began to explore the possibility of working at the clinic as a Parkland employee. (doc. 50, p. 10). Dr. Nassar testified that he had conversations on the subject in April or May of 2006 with Dr. Keiser and Sylvia Moreno, a nurse who is the director of HIV Services at Parkland. (*Id.*). About that time, Defendants contend that Dr. Nassar also began employment discussions with Central California Faculty Medical Group where he now practices. (*Id.*).

The parties offer starkly different accounts of the discussions and negotiations that followed. Dr. Nassar alleges that "Dr. Sam Ross, Parkland's Chief Executive,[3] made an offer to Dr. Nassar at a significantly higher rate of pay and Dr. Nassar accepted the position. Dr. Nassar had received the verbal offer, had taken the physical examination for the position, and had been provided with a start date." (doc. 11, p. 6).

Parkland denies that Dr. Ross made any offer, and contends that when Dr. Ross was approached about Dr. Nassar's employment in April 2006, he made an inquiry with Dr. Fitz, UT Southwestern's chair of the department of internal medicine, to determine whether the proposed arrangement was permissible under the Affiliation Agreement between Parkland and UT Southwestern. (doc. 50, p. 11). On April 17, 2006, Dr Ross noted Dr. Fitz's objection in an e-mail to Ms. Moreno. (*Id*; Def.'s App., p. 88). Dr. Ross's e-mail did not include any objection on his or Parkland's behalf, and it did not end the ongoing discussions between Parkland and Dr. Nassar.

Parkland contends that through the months of June and July, Ms. Moreno and Dr. Nassar continued discussion related to the possibility of Dr. Nassar becoming a Parkland employee. (doc.

---

[3] Dr. Ross's title was Executive Vice President and Chief Medical Officer. (Def.'s App., p 62).

50, p. 13). These discussions included negotiations of the potential salary. (*Id.* at pp. 13-14). Dr. Nassar submitted a curriculum vitae on Parklands intranet website on June 20, 2006, but did not submit the other application materials. (*Id.* at p. 11). Parkland admits that prior to preparing a draft offer letter, Henrietta Morgan, a physician recruiter at Parkland, "verbally extended a contingent offer" of employment to Dr. Nassar. (*Id.* at p. 13). Parkland argues that neither Ms. Moreno nor Dr. Keiser (who was a UT Southwestern employee) had any authority to hire any physicians at Parkland. (*Id.* at p. 11).

Parkland contends that on July 5, Dr Ross was presented for his signature a formal offer letter, which was dated July 3, to employ Dr. Nassar. (*Id.* at p. 12). Dr. Ross did not sign the letter and it was never sent to Dr. Nassar. (*Id.* at p. 13; doc. 54, p. 12). The letter had a tentative start date of July 10. (*Id.*).

   B.  *Dr. Nassar's Resignation From UT Southwestern and Move to California*

Dr. Nassar alleges that after he was promised a position at Parkland, he submitted his letter of resignation, dated July 3, 2006 and effective September 1, 2006. (doc. 54, p. 10.; doc. 1, Ex. C). In his resignation letter, Dr. Nassar stated "[t]he primary reason of my resignation is the continuing harassment and discrimination against me by the Infectious Diseases division chief, Dr. Beth Levine." He letter further stated "I have been threatened with denial of promotion, loss of salary support and potentially loss of my job," and claimed that his treatment "stems from religious, racial and cultural bias against Arabs and Muslims that has resulted in a hostile work environment." (*Id.*). Dr. Nassar did not provide his resignation letter, which he e-mailed to various UT Southwestern officials on July 7, to any Parkland personnel. (doc. 50, p. 14).

Dr. Nassar asserts that he was directed in a July 4 e-mail to proceed the next day with the

standard health/drug screening required for prospective Parkland. (doc. 54, p. 12). On July 6, when the signed offer letter from Parkland did not arrive, Dr. Nassar followed up with Ms. Morgan. (*Id.* at p. 15). Parkland contends that Ms. Morgan informed Dr. Nassar that she was still awaiting Dr. Ross's signature. (*Id.*). The offer letter still had not arrived on July 10, the day on which Dr. Nassar believed he was to start as a Parkland employee. (*Id.*) In response to Ms. Moreno's request for an update, Dr. Nassar replied by an email of July 10, "I don't have anything new. I got no offer letters and heard nothing from Sam Ross. I guess I am going West." (doc. 50, p. 16; Def.'s App. p. 158).

Parkland argues that Dr. Nassar's e-mail indicates that he was not willing to wait for Parkland to complete the hiring process. (doc. 50, p. 27). Nevertheless, it contends that it "continued processing" Dr. Nassar's application and had not yet made a determination on his employment. (doc. 50, p. 17). Parkland admits that Dr. Fitz mentioned Dr. Nassar's allegation of discrimination to Dr. Ross on or about July 10. (*Id.*)

By email of July 20, Dr. Nassar informed Dr. Ross that he accepted a job in California and listed his Dallas home for sale. (*Id.* at p. 18; Def.'s App., p. 89). In response, Dr. Ross responded with an e-mail that stated "Sorry we could not get it done for you – we are still trying to schedule meeting with Fitz and Levine" (*Id.*). Based in part on Dr. Ross's response, Dr. Nassar contends that "Parkland ratified UT [Southwestern]'s discriminatory practices by rescinding the employment letter when Dr. Nassar reported the discrimination." (doc. 54, p. 21). Parkland argues that it actively considered Dr. Nassar's application at least until he informed Dr. Ross that he accepted a job in California. (doc. 50, pp. 18, 28). Parkland further asserts that later, on August 9, Dr. Ron Anderson, Parkland's Chief Executive Officer, met with Dr. Nassar to discuss possible employment. (*Id.* at p. 20). Parkland contends that Dr. Nassar indicated he was no longer interested because had

already decided to move to California. (*Id.*).

      C.     *Procedural History*

Dr. Nassar filed a charge with the EEOC in which he alleged retaliation by Parkland. (Def.'s App. pp. 139-40). He stated that he "was denied employment for a Staff Physician at Parkland C.O.P.C. in retaliation for opposing or engaging in an activity protected under Title VII." (*Id.*). He filed this action on August 4, 2008, bringing claims for "employment discrimination," "tortious interference with business relations," and "exemplary damages." (doc. 11, pp. 8-9). On February 5, 2010, this Court dismissed Dr. Nassar's claims against Defendants Dr. Levine and Dr. Fitz, granted summary judgment on Dr. Nassar's claim for tortious interference, and concluded that fact issues remained regarding Dr. Nassar's Title VII claims against UT Southwestern. (doc. 99). By its motion (doc. 50), Parkland seeks summary judgment on all remaining claims against Parkland.

## II.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003)(per curiam). In a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). The non-moving party must show that the evidence is sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). In determining whether a genuine issue exists for trial, the Court will view all of the evidence in the light most favorable to the non-movant. *Id.* at 301.

## III.

## ANALYSIS

Dr. Nassar's sole claim against Parkland is for retaliatory failure to hire.[4] Parkland argues that it is entitled to summary judgment because the evidence establishes "that Plaintiff was never refused employment by Parkland."[5] (doc. 50, p. 1). Parkland insists that Dr. Nassar "voluntarily and affirmatively abandoned efforts to be hired by Parkland when he took a job in California before Parkland could finalize the process of considering him for hire." (*Id.*). Dr. Nassar argues that "Parkland ratified UTSW's discriminatory practices by rescinding the employment letter when Dr.

---

[4] Dr. Nassar's complaint does not explicitly state which claims are brought against which defendants. (doc. 11). Parkland argues that Dr. Nassar's claims for discrimination and interference are based only on alleged conduct by other defendants. (doc. 50, pp. 1-2). Dr. Nassar does not argue otherwise, but contends that fact issues preclude summary judgment on his retaliation claim against Parkland. (doc. 54, p. 27).

[5] Parkland also argues that Dr. Nassar's properly exhaust or plead a claim for retaliation. (doc. 50, p. 25). The Court finds that Dr. Nassar's retaliation claim was exhausted and properly plead. Because Dr. Nassar's EEOC charge included allegations like and related to those in his complaint, he has exhausted his administrative remedies. *Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d 389, 395 (5th Cir. 2000). Further, his complaint outlines the factual basis for a claim of retaliation, and need not contain a more precise formulation. *Sweikiewics v. Sorema N.A.*, 534 U.S. 506, 511-512 (2002).

Nassar reported the discrimination," making summary judgment improper. (doc. 54, p. 21).

Title VII makes it unlawful to discriminate against an applicant "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3. "Retaliation claims under Title VII are governed by the familiar three-step *McDonnell Douglas* test." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388 (5th Cir. 2007). First, Dr. Nassar must make out a prima facie case of retaliation. *Id.* (citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005)). If Dr. Nassar is able to establish a prima facie case of retaliation, the burden shifts to Parkland to state a legitimate, non-retaliatory reason for its decision. *Id* (citing *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 439 (5th Cir. 2005)). If Parkland does so, the burden shifts back to Dr. Nassar, who will then have the opportunity to provide evidence that Parkland's reason is untrue and merely a pretext for unlawful retaliation. *Id.*

"To establish a prima facie case of retaliation, an employee must demonstrate that (1) he engaged in an activity that Title VII protects; (2) he was subject to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *LeMaire*, 480 F.3d at 388. A report of discrimination and the filing of an EEOC complaint are protected activities, and Parkland does not challenge the first prong of Dr. Nassar's prima facie case. *Harvill*, 433 F.3d at 439.

Parkland challenges the second prong of Plaintiff's prima facie case, arguing that Dr. Nassar cannot show that he suffered any adverse employment action. (doc. 50, p. 26). To satisfy this prong, a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker

from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Ry Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Parkland argues that Dr. Nassar has not presented evidence of any adverse employment action and counters Dr. Nassar's contention that Parkland refused to hire him with evidence that it had not made any employment decision prior to Dr. Nassar announcing that he was leaving for California. (doc. 50, pp. 26 - 27). Parkland contends that even after Dr. Nassar's July 20 e-mail, which gave notice that he had accepted a job in California, it's CEO, Dr. Anderson, continued Parkland's efforts to employ Dr. Nassar. (doc. 50, p. 20). Dr. Nassar argues that "Dr. Ross admitted that Dr. Fitz discussed Dr. Nassar's allegations of discrimination with him during the time period that Dr. Nassar was awaiting written confirmation of his employment at Parkland." (doc. 54, p. 21). He also contends that Dr. Ross could not offer a legitimate non-discriminatory reason for not hiring Dr. Nassar and that "Dr. Keiser confirmed that there was a causal nexus between Dr. Nassar's allegation of discrimination and Parkland rescinding Nassar's employment." (*Id.* at pp. 21-22).

The Court concludes that Dr. Nassar has not presented evidence of an adverse employment action taken by Parkland and thus cannot establish a prima facie case of retaliation. While Dr. Nassar has pointed to fact issues relating to his receipt of an offer of employment from Parkland and alleged interference with that offer from UT Southwestern, he has not presented evidence that Parkland rescinded that offer, rejected his application, or otherwise decided not to hire him. Dr. Nassar has not presented evidence from which a reasonable jury could conclude that Parkland removed his application from consideration or took any other action that is inconsistent with further consideration of his application before Dr. Nassar informed Dr. Ross that he had accepted another

job. Dr. Nassar's resignation was to be effective September 1. (doc. 11, Ex. C). Viewed in the light most favorable to Dr. Nassar, the evidence suggests that Dr. Nassar was told that an offer letter with a start date of July 10 was prepared and awaiting approval. However, Parkland has met its burden of establishing that no genuine issue of material fact exists on a crucial element of Dr. Nassar's prima facie case. *Provident Life & Accident Ins. Co.* 274 F.3d at 991. Absent evidence of an adverse employment decision by Parkland, Dr. Nassar cannot establish a prima facie case of retaliation. Accordingly, the Court GRANTS Parkland's motion for summary judgment. (doc. 49).

## IV. Conclusion

For the reasons stated above, the Court finds that Dr. Nassar has failed to establish a prima facie case of retaliation against Parkland. Accordingly, the Court **GRANTS** Defendant Parkland Health & Hospital System's motion for summary judgment (doc. 49).

**SO ORDERED**

**SIGNED: February 19, 2010**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE